NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | | |
|---|---|---|
| ROBERT L. SMALL, | : | Civ. Action No. 20-11033(RMB) |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| KATHYRN MACFARLAND, | : | |
| SUPERINTENDENT SOUTH | : | |
| WOODS STATE PRISON AND | : | |
| ATTORNEY GENERAL | : | |
| OF THE STATE OF NEW JERSEY, | : | |
| | : | |
| Respondents | : | |
| | : | |

RENÈE MARIE BUMB, CHIEF UNITED STATES DISTRICT JUDGE

This matter comes before the Court upon Petitioner Robert L. Small's

("Petitioner") petition for a writ of habeas corpus under 28 U.S.C. § 2254,

challenging his 2008 state court conviction on attempted murder, armed robbery, and

multiple assault and weapons charges.  (Pet., Dkt. No. 1.)  Respondents filed an

answer in opposition to habeas relief.  (Answer, Dkt. No. 7.)  Petitioner did not file a

reply brief.  For the reasons set forth below, the Court denies the petition for writ of

habeas corpus.

## I.    PROCEDURAL HISTORY

In October 2005, Petitioner was charged by Indictment in Camden County,

New Jersey with first-degree attempted murder in violation of N.J.S.A. 2C:5-

1/2C:11-3a (Count One); second-degree aggravated assault, in violation of N.J.S.A. 2C:12-1b(1) (Count Two); third-degree aggravated assault, in violation of N.J.S.A. 2C:12-1b(2) (Count Three); third-degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4d (Count Four); fourth-degree unlawful possession of a weapon, in violation of N.J.S.A. 2C:39-5d (Count Five); and first-degree armed robbery, in violation of N.J.S.A. 2C:15-1 (Count Six).  (Indictment as amended, Dkt. No. 7-3, Dkt. No. 7-59 at 23.)  At a pretrial hearing on January 29, 2007, the Honorable Frederick J. Schuck addressed Petitioner's motion for self-representation.  (Status Conf. Tr., Dkt. No. 7-51.)  Judge Schuck stated that, in a report dated December 12, 2006, Petitioner had been found competent to represent himself.  (*Id.* at 2-3.)  After a lengthy colloquy with Petitioner about the many disadvantages and likely negative outcome of his self-representation at trial, Judge Schuck concluded that Petitioner had knowingly and intelligently waived his right to counsel, and granted his motion for self-representation.  (*Id.* at 4-26.)  On June 27, 2007, the Honorable Louis R. Meloni denied Petitioner's motion to dismiss the Indictment.  (Mot. Tr., Dkt. No. 7-55 at 6-8.)  Judge Meloni also denied Petitioner's motion to gain access to the jail's law library for up to four hours per day, seven days per week.  Instead,  Petitioner would continue to have access to the law library no less than one hour every other weekday, assuming Petitioner was not in disciplinary confinement.  (Order, Dkt. No. 7-5 at 1.)

On October 9 and 10, 2007, the Honorable Irvin J. Snyder presided over Petitioner's *Miranda*[1]/*Wade*[2] hearing.  (*Miranda/Wade* Hearing Tr., Dkt. Nos. 7-56, 7-57.)  At the conclusion of the motions hearing, Judge Snyder found that the witnesses' pretrial identifications of Petitioner were reliable, and Petitioner's in custody statements were admissible.  (Dkt. Nos. 7-57 at 38-49, 44-46.)  Petitioner's jury trial commenced on November 1, 2007, before the Honorable Stephen M. Holden.   (Trial Tr., Dkt. Nos. 7-61 through 7-71.)  The jury returned its verdict on November 30, 2007.  The jury acquitted Petitioner of armed robbery and found him guilty on all other charges.  (Trial Tr., Dkt. No. 7-71 at 133-35.)  After a hearing on January 25, 2008, Judge Holden denied Petitioner's motions for a new trial and for judgment of acquittal.  (Mot. and Sent. Tr, Dkt. No. 7-72 at  3-4.)  On the same day, Judge Holden granted the State's motion for an extended term sentence and sentenced Petitioner to 35-years imprisonment with 85% parole ineligibility.  (Dkt. No. 7-72 at 4-5, 11-12; JOC, Dkt. No. 7-7.)  Petitioner appealed, and the New Jersey Superior Court, Appellate Division affirmed Petitioner's conviction and sentence on July 7, 2011.  (App. Div. Op., Dkt. No. 7-15.)  The New Jersey Supreme Court ("NJSC")  denied Petitioner's petition for certification on February 2, 2012.  (NJSC Order, Dkt. No. 7-20.)

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *U.S. v. Wade*, 388 U.S. 218 (1967).

On April 24, 2012, Petitioner filed an application for post-conviction relief ("PCR"). (*Pro Se* PCR Pet., Dkt. No. 7-21.) On July 16, 2012, Judge Schuck assigned PCR counsel to Petitioner. (Order, Dkt. No. 7-22.) On or about August 21, 2013, PCR counsel informed the court that she had not received any discovery, pre-trial motions or transcripts from Petitioner's criminal trial, which were necessary for her to investigate Petitioner's potential PCR claims. (Letter, Dkt. No. 7-23.) One month later, the court set a PCR briefing schedule, but PCR counsel had received only half of Petitioner's file. (PCR Briefing Sched., Dkt. No. 7-24.) On the deadline set for briefing, Petitioner's counsel did not have all the necessary transcripts and sought an extension of time. (Letter, Dkt. No. 7-25.) After warning PCR counsel that the case would be dismissed without prejudice absent a timely filed PCR brief, Judge Schuck dismissed the petition without prejudice on May 15, 2014. (PCR Order, Dkt. No. 7-27).

About two-and-a-half years later, Petitioner refiled his PCR motion on January 24, 2017. (PCR Mot., Brief, and Cert. of Counsel, Dkt. Nos. 7-28, 7-29, 7-30.) On August 17, 2017, after finally locating the missing transcript of Judge Schuck's colloquy with Petitioner about his waiver of counsel, PCR counsel withdrew the PCR claim that there had been no hearing on Petitioner's motion to represent himself, or that the hearing was inadequate. (Letter, Dkt. No. 7-31.) On November 17, 2017, Judge Schuck denied Petitioner's PCR petition. (PCR Order, Dkt. No. 7-35.)

On March 13, 2018, Petitioner filed a notice of appeal of the PCR court's decision, with a notice of motion to file the notice of appeal as within time.  (Not. of Appeal, Dkt. Nos. 7-36, 7-37 and 7-38.)  By order dated March 29, 2018, the Appellate Division granted the motion to file the notice of appeal as within time. (App. Div. Order, Dkt. No. 7-45.)  On July 3, 2019, the Appellate Division affirmed the denial of Petitioner's PCR petition.  (PCR Opinion, Dkt. No. 7-46.)  On November 21, 2019, the New Jersey Supreme Court denied Petitioner's petition for certification. (NJSC Order, Dkt. No. 7-50.)  On August 21, 2020, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which he signed and presented to prison authorities for mailing on July 21, 2020.  (Pet., Dkt. No. 1 at 16.)

## II.   DISCUSSION

### A.   Affirmative Defense:  Untimeliness of the Petition

Respondents argue that this Court should dismiss the habeas petition because Petitioner filed his § 2254 habeas petition after expiration of the one-year statute of limitations under 28 U.S.C. § 2244(d)(1).  (Answer, Dkt. No. 7 at 33-40.) Furthermore, Petitioner has not established that he is entitled to statutory or equitable tolling.  Respondents submit that Petitioner's Judgment of Conviction ("JOC") was entered on January 25, 2008 (Dkt. No. 7-7), and his direct appeal was denied by the Appellate Division on July 7, 2011.  (Dkt. No. 7-15.)  On February 2, 2012, the New Jersey Supreme Court denied Petitioner's petition for certification on direct appeal.  (Dkt. No. 7 at 37.)  Petitioner then had ninety days, until May 3,

2012, to seek certiorari from the U.S. Supreme Court. (Answer, Dkt. No. 7 at 37, citing N.J. Sup. Ct. R. 13.1.) Petitioner chose not to seek certiorari. Thus, the one-year habeas limitations period began at the expiration of this 90-day period, on May 4, 2012. In the meantime, Petitioner filed a PCR petition on April 24, 2012. (PCR Pet., Dkt. No. 7-21.) This tolled the habeas limitations period pursuant to § 2244(d)(2), without any days running on the one-year "clock."

Respondents contend that on May 15, 2014, the day on which the PCR court dismissed Petitioner's PCR petition without prejudice, his PCR proceeding was no longer pending within the meaning of § 2244(d)(2). Therefore, Petitioner's one-year habeas limitations period began to run, and it expired one year later, on or about May 15, 2015. Although Petitioner refiled his PCR petition on January 24, 2017, and the state courts treated it as timely, Respondents maintain that the one-year habeas limitations period had already expired.

Respondents recognize that the doctrine of equitable tolling is applicable to the habeas statute of limitations. Respondents argue that PCR counsel's failure to advise Petitioner that his habeas limitations period began to run after his PCR petition was dismissed without prejudice is not an extraordinary circumstance required for equitable tolling of the habeas limitations period. (Answer, Dkt. No. 7 at 40, citing *LaCava v. Kyler*, 398 F.3d 271, 276 (3d Cir. 2005) (quoting *Merritt v. Blaine*, 326 F.3d 157, 169 (3d Cir. 2003); *Sistrunk v. Rozum*, 674 F.3d 181, 189–90 (3d Cir. 2012)).

### 1.    Legal Standard

The statute of limitations for state prisoners seeking habeas corpus relief under 28 U.S.C. § 2254 is found in 28 U.S.C. § 2244(d), which states, in relevant part:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review….

A judgment becomes final on direct appeal "'at the conclusion of review in the United States Supreme Court or when the time for seeking certiorari review expires'" *Jones v. Morton*, 195 F.3d 153, 157 (3d Cir. 1999) (quoting *Kapral v. United States*, 166 F.3d 565, 575 (3d Cir. 1999)).  At that point, the habeas statute of limitations begins to run until it is tolled or it expires.  *Swartz v. Meyers*, 204 F.3d 417, 419 (3d Cir. 2000) (citations omitted).

Statutory tolling is governed by § 2244(d)(2), which provides:  "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  Respondents argue the PCR petition was no longer "pending" within the meaning of § 2244(d)(2) after it was dismissed without prejudice on May 15, 2014.  (Answer, Dkt. No. 7 at 35, 39.)

2.    **Analysis**

The U.S. Supreme Court has addressed the meaning of "pending" as used in

§ 2244(d)(2). The Court began with the ordinary meaning of the word. *Carey v.*

*Saffold*, 536 U.S. 214, 219 (2002).

> The dictionary defines "pending" (when used as an
> adjective) as "in continuance" or "not yet decided."
> *Webster's Third New International Dictionary* 1669 (1993). It
> similarly defines the term (when used as a preposition) as
> "through the period of continuance ... of," "until the ...
> completion of." *Ibid.* That definition, applied in the
> present context, means that an application is pending as
> long as the ordinary state collateral review process is "in
> continuance"—i.e., "until the completion of" that process.
> In other words, until the application has achieved final
> resolution through the State's post-conviction procedures,
> by definition it remains "pending."

*Id.* at 219–20 (2002).  The Court rejected the proposal that "pending" meant "under

court consideration." The Court reasoned this would exclude intervals between a

lower court's entry of judgment and the timely filing of an appeal at the next state

court level, which would, in turn, encourage state prisoners to file federal habeas

petitions before completing a full round of collateral review in the state courts, as

required by § 28 U.S.C. § 2254(c).  *Id.* at 20 (citing *O'Sullivan v. Boerckel*, 526 U.S.

838, 845 (1999)).

More recently, the Third Circuit described Section 2244(d)(2)'s "pending"

requirement as forward-looking.  *Martin v. Adm'r New Jersey State Prison*, 23 F.4th 261,

271 (3d Cir.), *cert. denied sub nom. Martin v. Johnson*, 214 L. Ed. 2d 111 (2022).  Thus,

after a PCR petition is denied with prejudice and the time to appeal expires, "the

8

state review process is done; it is not dormant, it is not latent, and it is not hibernating…." *Id.* This case, however, presents the question of what happens when the PCR petition is denied without prejudice? Looking forward after the PCR petition is denied without prejudice, the case has the potential to be reopened.

Petitioner, through counsel, refiled his PCR petition on January 24, 2017, raising a new claim of ineffective assistance of appellate counsel for failing to raise a Sixth Amendment waiver of counsel claim on appeal. (PCR Tr., Dkt. No. 7-73 at 2-3.) As to the timeliness of the refiled PCR petition, according to PCR counsel "the Court expressly stated that [the PCR petition] could be re-filed with a retroactive filing date."[3] (Petr's PCR Brief, Dkt. No. 7-29 at 5; Cert. of PCR Counsel ¶3; Dkt No. 7-30.) The PCR court reopened the PCR petition and addressed the merits of the claims, although the newly added claim was withdrawn by PCR counsel. (PCR Tr., Dkt. No. 7-73.) Therefore, in this unusual circumstance, where a missing transcript could not be found for years, the state review process was dormant and remained "pending" under § 2244(d)(2). *See, Banks v. Pierce*, No. 17-2961, 2018 WL 1446402, at *3 (D.N.J. Mar. 23, 2018) (assuming, without deciding, that "the habeas statute of limitations remained tolled after the PCR court's ... dismissal without prejudice, [because] the court's order did not address the merits of the PCR petition and was not a final, appealable order.") Petitioner's original, properly filed PCR

---

[3] The Certification of PCR counsel contains citations to exhibits that were not provided to this Court, presumably including a document indicating that the original PCR petition could be reopened with a retroactive filing date. (Cert. of PCR Counsel, Dkt. No. 7-30.)

petition was pending from the date it was filed on April 24, 2012, through January 2, 2018, the end of the 45-day period that Petitioner had to appeal the November 17, 2017 order denying his PCR petition.  (PCR Order, Dkt. No. 7-35.)[4]

Petitioner did not file a timely PCR appeal.  Therefore, his habeas limitation period began to run on January 2, 2018.  28 U.S.C. § 2254(d)(1), (2).  Petitioner filed a notice of PCR appeal on March 13, 2018, along with a motion to file as within time.  This untimely filing did not toll the habeas statute of limitations period, but when the Appellate Division granted Petitioner's motion to file his appeal as within time, the statute of limitations was tolled on March 29, 2018.  *See*, *Martin*, 23 F.4th at 271 ("a state court's acceptance of an untimely appeal breathes new life into the state PCR proceeding—and may at that point trigger § 2244(d)(2)'s tolling mechanism….")  Therefore, 86 days of Petitioner's habeas clock ran between January 2, 2018 and March 29, 2018.  The habeas limitations period remained tolled through the end of PCR proceedings, November 21, 2019, the day the New Jersey Supreme Court denied Petitioner's petition for certification on PCR appeal.  The habeas clock began to run on November 22, 2019.  Petitioner had 279 days remaining to timely file his habeas petition, or until August 27, 2020.  Even without the benefit of the prison mailbox rule,[5] Petitioner timely filed his habeas petition

---

[4] January 1, 2018 was a holiday and is excluded.  "[T]he Federal Rules of Civil Procedure apply, by their own terms, to habeas cases."  *Wilson v. Beard*, 426 F.3d 653, 662 (3d Cir. 2005) (applying Rule 6(a) computing time).

[5] "[A] pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court."  *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).

when it was received by this Court on August 21, 2020.  Therefore, the Court turns

to the merits of the petition.

### B.    Standard of Law:  Section 2254(d)

The standard for granting a federal habeas corpus petition of a state prisoner is

governed by 28 U.S.C. § 2254(d), as follows:

> [a]n application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

The Third Circuit has directed habeas courts to follow a two-step analysis

under § 2254(d)(1).  *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 253 (3d

Cir. 2020) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir.

1999) (*en banc*), *cert. denied* 528 U.S. 824 (1999)).  First, courts should "determine

what the clearly established Supreme Court decisional law was at the time

Petitioner's conviction became final" and "identify whether the Supreme Court

has articulated a rule specific enough to trigger 'contrary to' review."  *Id.* at 253

(quoting *Fischetti v. Johnson*, 384 F.3d 140, 148 (3d Cir. 2004)).  "The 'clearly

established Federal law' provision requires Supreme Court decisions to be viewed

through a 'sharply focused lens.'" *Id.* Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), only if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" *Williams*, 529 U.S. at 405-06. Second, if Supreme Court precedent is not specific enough to trigger contrary review, habeas courts should "evaluate whether the state court unreasonably applied the relevant body of precedent." *Rosen*, 972 F.3d at 253 (quoting *Matteo*, 171 F.3d at 888)).

Under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410). For relief under this provision, the state court's decision "evaluated objectively" must have "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Rosen*, 972 F.3d at 252 (quoting *Matteo*, 171 F.3d at 890)). A habeas court must frame the "relevant question as whether a fairminded jurist could reach a different conclusion." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) or, in other

words, whether "every fairminded jurist would disagree" with the state court. *Mays*

*v. Hines*, 141 S. Ct. 1145, 1149 (2021).

Habeas review is deferential to a state court's determination of facts. 28

U.S.C. § 2254(e)(1) provides that:

> [i]n a proceeding instituted by an application for a writ of
> habeas corpus by a person in custody pursuant to the
> judgment of a State court, a determination of a factual
> issue made by a State court shall be presumed to be
> correct. The applicant shall have the burden of rebutting
> the presumption of correctness by clear and convincing
> evidence.

"The petitioner must show that the state court verdict was based on an

unreasonable determination of the evidence and that a reasonable factfinder could not

have reached the same conclusion." *Rosen*, 972 F.3d at 252 (3d Cir. 2020) (citing

*Campbell v. Vaughn*, 209 F.3d 280, 291 (3d Cir. 2000)).

## C.   Appellate Division's Findings of Fact on Direct Appeal

On Petitioner's direct appeal of his conviction, the Appellate Division made

the following findings of fact.

> On May 23, 2005, the victim, Neal Steen, was walking to
> a Hess Express convenience store located at a jug handle
> where Route 130 intersects with Marlton Pike in
> Pennsauken. Although an acknowledged drug addict with
> two prior convictions, Steen claimed to not have been
> under the influence of drugs on that morning. Before Steen
> entered the store, defendant, a paraplegic confined to a
> wheelchair, "rolled up" to him and said, "Yo, let me hold
> something," which Steen understood to mean defendant
> "needed some money." Steen was casually acquainted
> with defendant, but told him he had no money to spare.

13

While defendant watched through a store window, Steen withdrew $20 from the ATM machine, purchased a pack of cigarettes, and put the change in his front pocket. As he left, defendant again asked him for money. Steen refused and walked away, heading through the intersection toward a McDonald's restaurant across the street. Defendant grabbed him from behind, and Steen fell face-down to the ground, defendant on his back.

Defendant stabbed Steen in the buttocks, legs, shoulder, and in the back of his left arm. Steen managed to turn over, coming face-to-face with defendant, who then stabbed him in the chest. An unknown person pulled defendant away, after which Steen walked to the curb and sat down, "covered in blood from head to toe." The jacket, pants, and shirt he wore that day, introduced by the State as evidence during the trial, bore numerous slash marks corresponding to the areas where Steen said he had been stabbed. Steen believed defendant must have taken the change from his $20 bill during the attack because his shirt pocket was empty.[6]

Three eyewitnesses, all of whom identified defendant both at a show-up shortly after the incident and in court, were in the vicinity of the intersection at the moment the attack occurred. Caryn Evans was driving the third car in the middle lane of the jug handle when she saw a tall white man with silver hair walking across the street in front of her, followed by an African–American man with dreadlocks in a wheelchair. She had seen defendant struggle to get up the ramp in front of the Hess station, and "felt bad" for him. The man who was walking kept waving defendant away, and she assumed defendant was asking him for money.

The two men reached the third lane of traffic when Evans, who had a clear and unobstructed view, saw defendant "fl[y] out of" his wheelchair and knock the other man down onto his face. Defendant had his victim in a headlock and began pounding, punching, and hitting him

---

[6] Defendant was also indicted for first-degree armed robbery, N.J.S.A. 2C:15–1.  The jury acquitted him of that offense.  *Small*, 2011 WL 2637161, at *1 n. 1.

in the face and head. Evans watched as defendant reached into his back right pocket, pulled out a silver-colored knife, with a blade approximately the size of her hand, and stabbed the other man in the shoulder area at least five or six times. She did not see defendant reach into the victim's pocket but saw the man cover his head and try unsuccessfully to push defendant away. Evans blew her car horn, hoping someone would respond, after which defendant got off the man, pulled his wheelchair over, climbed onto it, and left "as fast as he could." The victim, who appeared to be "dazed," stumbled towards a McDonald's also at the intersection. Evans called police, reported the assault, and pulled over to await their arrival. Claudious Walker, an employee at a Valvoline Oil station across the street from the Hess station, was sitting by the shop's bay doors facing Marlton Pike when he noticed a white man walking towards him followed by an African–American man in a wheelchair wearing dreadlocks. When the two reached the middle of the intersection, defendant "nudged" the other man and knocked him to the ground as he turned. Defendant jumped on the victim, yelled "where's my money at," and punched him repeatedly in the face with a closed fist. As Walker approached to aid the victim, defendant pulled a knife, approximately seven or eight inches in length, out from his pocket and stabbed the man in the arms and legs while screaming about money. Steen, who "had blood all over him," broke free and ran towards Walker. Meanwhile, defendant scooted to his wheelchair, climbed into it, and headed toward Marlton Pike exclaiming "I got one."

The third eyewitness, Dolores Rosas, was seated in her vehicle when she saw a white man with "blondish hair" walk in front of her car, followed by an African–American man in a wheelchair, wearing a black and white bandana and dreadlocks. When the traffic light turned green, Rosas saw movement out of the corner of her eye and initially thought defendant had fallen out of his wheelchair. When she looked, she saw defendant lying on top of a man who was face-down in the street. Defendant stabbed the man in the back of the legs with a knife that had "jagged edges" and looked like a "hunter's knife." The man eventually broke free and walked toward the McDonald's, while

15

defendant quickly headed toward Marlton Pike. She too called police.

Sergeant Michael Basileo and Detective William Wheeler arrived within ten minutes of the report. They spoke to the witnesses and obtained a description of the assailant, while a patrolman broadcast the description on police airwaves. Shortly thereafter, Patrolman Scott Gehring detained defendant approximately one mile from the crime scene. Patrolman James Sanders, who also identified defendant at trial, arrived seconds after Gehring. Both testified defendant wore dreadlocks, was seated in a wheelchair, wore a gray shirt and white pants, and had blood on his hands, shirt, and pants. When Gehring asked defendant about the knife, defendant retrieved a bloodied seven-inch folding knife from his right front pocket. At trial, Gehring demonstrated the knife could be flipped open with only one hand, making a clicking sound similar to a switchblade, and Evans and Walker identified it as the weapon defendant used to stab Steen.

Gehring and Sanders read defendant his <u>Miranda</u> warnings, handcuffed him, helped him into the back of the patrol car, and placed his wheelchair in the trunk. The officers drove him to a more secure location to which Evans, Walker, and Rosas were separately driven. Each positively identified defendant as the assailant.
At police headquarters, defendant was placed in a holding cell after being advised of his <u>Miranda</u> rights a second time. When Detective Brian Polaski attempted to fingerprint him, defendant refused to cooperate, making an obscene gesture and a vulgar comment. After Polaski left the room, defendant called out to Basileo and asked "if the guy [who was stabbed] survived?" When Basileo responded, defendant expressed disappointment, saying he thought he "had his first body." Basileo said he thought "you guys knew each other," to which defendant replied that the victim owed him money.

As defendant was changing into a jumpsuit, a pen fell from his wheelchair to the floor. Defendant then looked at Polaski saying, "I could have stabbed that n——r–hater

16

too," a comment overheard by Basileo and Wheeler. No money was found in defendant's clothing.

When interviewed at the hospital, Steen, who appeared oriented, said defendant attacked him from the front, not from behind, and that he was missing $7. He had at least ten stab wounds to his torso and extremities; the most significant injury being one that penetrated his chest wall, causing a potentially fatal pneumothorax, or collapsed lung. Dandrea Joseph, M.D., the trauma surgeon who treated Steen at the hospital, testified this wound resulted from the use of great force because the weapon pierced several layers of skin, muscle, and tissue in addition to the pleura, a membrane surrounding the lungs.

Approximately eighteen months after the stabbing incident, from October 29 to November 3, 2006, defendant and Steen were imprisoned together, on unrelated charges, in a "medical unit confined area." Steen said he attempted to be courteous to defendant because he was afraid of him; however, he denied ever saying he would not testify against him or that defendant was not the man who stabbed him.

Christopher Szymkowiak, a forensic scientist, testified as the State's DNA expert. Within a reasonable degree of scientific certainty, he concluded Steen was the source of the DNA profile obtained from defendant's gray shirt, the knife, and the flesh found on the knife. He also testified his conclusion was subject to peer review by another forensic scientist and to administrative review by his supervisor, both of whom agreed with his conclusion.

At a pretrial Sands[7] hearing, the State presented proof defendant had been convicted of drug distribution and aggravated assault on a police officer in 1990. In 1997, some three years after his release from prison, he was convicted of child endangering in Pennsylvania. The court ruled that only the drug and child endangering convictions could be presented to the jury. On the stand, defendant acknowledged his drug distribution offense and resulting

---

[7] *State v. Sands*, 386 A.2d 378 (N.J. 1978).

four-year imprisonment, as well as the child endangering and the eleven-to-fifty-nine-month sentence imposed by the Pennsylvania court.

Defendant testified to a quite different version of events, which we recount in detail. Defendant alleged he gave Steen a $50 bill to purchase a pack of cigarettes and some other items for him, as he could not use the handicapped ramp into the Hess store. At the time, he was wearing a gray shirt over a white t-shirt, a green, white, and black bandana, and white or tan sweatpants. After Steen left the store, he gave defendant only $5 in change, insisting defendant had given him a $20 and not a $50 bill. The men argued as a result.

Defendant claimed that suddenly a young, light-skinned African–American man interjected himself into the dispute and said he had just seen Steen hand the clerk a $50 bill. Steen told the young man to mind his own business, and the two began to push and punch each other. The young man pulled out a knife and stabbed Steen repeatedly. When he let Steen go, he told defendant to stay put as he would be right back, and ran across the street to the McDonald's.

Steen stood up and continued to argue, demanding defendant identify the assailant, and threatening to falsely accuse him instead. When defendant persisted in demanding that Steen return his change, Steen allegedly pulled him from the wheelchair, into the third lane of traffic, and kicked him. Defendant grabbed Steen's foot, wrestled him to the ground and began to punch him. Steen got up and tried to "stomp" on defendant, who rolled away on the bloody ground, thus explaining the presence of Steen's blood on the back shoulder of his shirt. According to defendant, the young man, knife in hand, saw that Steen was attacking defendant a second time and again came to his aid. This time Steen ran toward the Valvoline station. The young man helped defendant into his wheelchair, pushed him toward Marlton Pike, and asked him to hold the knife, dropping it into his lap. He fled in a car driven by an unidentified girl. Defendant closed the knife, put it in his pocket, and proceeded on to

Marlton Pike, thinking "nothing of it" because he had no idea he would be suspected of stabbing Steen.

In support of his account, defendant produced several witnesses. First, Wade Tyler said he had been at the Hess station on the date in question and heard defendant arguing with Steen about his $50. Further, he saw a light-skinned African–American young man engage in a pushing match with the victim, saying words to the effect of "Why don't you just give him his money." Someone then screamed "oh s—t, he stabbed him," at which point Tyler left the scene because he had outstanding warrants, was driving illegally, and hated the Pennsauken police. Tyler had four prior convictions, a 2006 third-degree using false identification, N.J.S.A. 2C:21–2.1, a 1999 fourth-degree falsifying records, N.J.S.A. 2C:21–4(a), a 1995 third-degree unlawful possession of a weapon, N.J.S.A. 2C:39–5, and a 1994 third-degree receiving stolen property, N.J.S.A. 2C:20–7.

Defendant also called Polaski, who testified Steen initially gave his name as Blaine D. Steen, an alias the victim sometimes used. In contrast, Sampson, whom defendant also called, said Steen gave his correct name. Sampson spoke to three witnesses, Rosas, Walker, and a Steven DeShields, who did not testify at trial, and each told him defendant was wearing a gray, not a white, shirt. Defendant called Gehring for the purpose of having him say that the radio dispatch described the assailant as a "black male wearing a gray shirt with dreadlocks and a wheelchair."

Defendant claimed that when he and the victim were "confined" in the same unit approximately eighteen months after the stabbing, Steen said he had informed police that defendant was not the assailant, and that Steen assured him that he would not testify against him at trial. During this time, they played chess, reminisced about old friends, and generally had a good time together.

Defendant presented Antonio Rodriguez and Luis Lopez on the subject of Steen's "recantation." Both had prior convictions and had been in the "confined area" with

19

Steen and defendant. They corroborated defendant's version of his discussions with Steen about the charges. In fact, Rodriguez said he heard Steen ask defendant why he was "still being incarcerated for a violent act." Steen allegedly told Rodriguez that defendant was not the person who stabbed him and that he was suing McDonald's for his injuries.

Lopez testified Steen did not appear fearful of defendant and even played chess with him while confined.  Lopez also heard Steen stating that defendant was not his assailant, and that he had not accused him of the crime. Finally, defendant called several witnesses to testify as to the victim's reputation for untruthfulness in the community. Eric Bullock said he had smoked crack cocaine with Steen, known on the streets as "Dougie the Con Man," and that he was considered a "flim-flam artist," although this remark was stricken. Samuel Pierson reported he had smoked crack cocaine with Steen, and that he was known to be untruthful. Ramon Rivera, who sold oils and incense for defendant on the streets of Camden, said Steen lived in abandoned houses and a trailer, and that a lot of people did not like him because he was a thief. Rivera, who resided with his father in a crack house, also testified he often saw Steen and defendant at his father's home "laughing, joking, [and] playing cards." Bullock, Pierson, and Rivera all had criminal histories.

*State v. Small*, No. A-3552-07T4, 2011 WL 2637161, at *1–5 (N.J. Super. Ct. App. Div. July 7, 2011).

### D.    Grounds One and Two of the Petition

#### 1.    The Parties' Arguments

In Grounds One and Two of his habeas petition, Petitioner asserts the trial court denied his due process right to a fair trial by failing to inform Petitioner, who was representing himself at the charge conference, of his right to a passion/provocation jury charge.  Petitioner alleged the victim took $50 from him to

20

go to the convenience store and failed to give him the correct change.  In his brief, Petitioner explains that he wrote a letter to the prosecutor on August 1, 2005, indicating that Steen initiated the fight by throwing Petitioner out of his wheelchair, kicking him, and that Steen falsely accusing Petitioner of stabbing him.  This was consistent with Petitioner's testimony at trial.  The court found that there was sufficient evidence of a fistfight between Petitioner and Steen to permit Petitioner to introduce a self-defense theory.  Petitioner contends that if the facts supported a self-defense charge, they also supported a passion/provocation charge.  Specifically, Petitioner's version of events was that someone else attacked Steen outside the Hess station, and then Steen dumped Petitioner out of his wheelchair on the highway and started kicking him.  The original attacker attacked Steen again, and then gave Petitioner the knife to protect himself.

In response to Grounds One and Two of the petition, Respondents note Petitioner first raised the issue of a passion/provocation charge on direct appeal. The Appellate Division, viewing the evidence in the light most favorable to Petitioner, found the victim's alleged theft of $50 was not adequate provocation for attempted manslaughter.  Therefore, the trial court did not err in failing to *sua sponte* give the jury a passion/provocation charge.  Further, Respondents submit that this claim rests purely on state law and is not cognizable in a federal habeas petition. Recognizing, however, that Petitioner alleged the trial court's failure to give the jury instruction violated his right to due process, Respondents submit the passion/provocation instruction was not appropriate where the defense strategy was

to deny that Petitioner stabbed the victim intentionally or otherwise.  Even if Petitioner had not testified, the disagreement over $50 was not adequate provocation to defend attempted manslaughter.

### 2.    Clearly Established Federal Law

"[Section 2254(d)(1) requires federal courts to 'focu[s] on what a state court knew and did,' and to measure state-court decisions against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'"  *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 182 (211) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)).  For habeas review, the last reasoned state court decision on Grounds One and Two of the habeas petition is the July 7, 2011 Appellate Division Opinion on direct review.

The Court begins by identifying the applicable clearly established federal law. The Supreme Court has held "the fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991).  In addressing due process challenges to jury instructions on habeas review, "[t]he only question … is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Id.* at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  Also relevant to jury charges, "[t]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged. Proof of the nonexistence of all affirmative defenses has never been constitutionally required."  *Patterson v. New York*, 432 U.S. 197, 210 (1977).

Furthermore, a State can place the burden of proving an affirmative defense on the defendant. *Gilmore v. Taylor*, 508 U.S. 333, 350 (1993) (citation omitted). In noncapital cases, the Supreme Court has never determined that the Due Process Clause requires states to charge juries on lesser-included offenses. *See generally, Schad v. Arizona*, 501 U.S. 624 (1991) *abrogation on other grounds recognized by Edwards v. Vannoy,* 141 S.Ct. 1547 (2021).

Applicable here, under New Jersey law, "when, … a defendant requests a charge on passion/provocation manslaughter as a lesser-included offense of murder, the trial court should instruct the jury on that form of manslaughter if an examination of the record discloses that the evidence satisfies the rational-basis standard-that is, that 'it would not be idle to have the jury decide' whether the defendant had committed the lesser-included offense.'" *State v. Mauricio*, 568 A.2d 879, 886–87 (N.J. 1990) (citing *State v. Crisantos*, 508 A.2d 167 (N.J. 1986) (quoting *State v. Sinclair*, 231 A.2d 565 (N.J. 1967)).

On Petitioner's direct appeal, the Appellate Division held that a jury instruction on passion/ provocation was not required by New Jersey state law because no jury could reasonably have found adequate provocation. *See, Small*, No. 2011 WL 2637161, at *13. State law decisions are unreviewable under § 2254. Because the Supreme Court has held the Due Process Clause does not require a State to prove the nonexistence of an affirmative defense or to charge a jury on lesser-included offenses in non-capital cases, Petitioner has failed to allege a cognizable Due Process Claim based on the trial court's failure to *sua sponte* give a

passion/provocation jury charge.  Therefore, Grounds One and Two of the petition are denied.

### E.    Ground Three of the Petition

#### 1.    The Parties' Arguments

For Ground Three of his petition, Petitioner contends the trial court's withdrawal of the self-defense instruction deprived him of his best defense and relieved the State of the burden to prove each element of the crime, in violation of his Sixth Amendment right to a fair trial, and in violation of the Fourteenth Amendment Due Process Clause.  (Pet., Dkt. No. 1 at 26.)

Respondents submit the self-defense instruction was not appropriate because Petitioner's defense was that someone else stabbed the victim.  (Answer, Dkt. No. 7 at 49-55.)  The trial court only agreed to the self-defense instruction because Petitioner had testified that he punched and beat Steen after Steen pulled Petitioner out of his wheelchair.  After charging the jury on self-defense, the trial court corrected its instruction because Standby counsel explained self-defense was inconsistent with Petitioner's testimony that he did not stab the victim.  The trial court then informed the jury that it had been brought to the court's attention that Petitioner had testified to self-defense by hand-to-hand fighting, not the use of deadly force.  Thus, the court advised the jury to disregard any of the elements of the self-defense charge pertaining to the use of deadly force.  Respondents submit that the Appellate Division's denial of this claim was not contrary to or an unreasonable application of clearly established federal law.

24

## 2.    Analysis

The Appellate Division denied this claim on July 7, 2011.  As discussed above, the pertinent clearly established federal law on habeas challenges to jury instructions is *Estelle*, 502 U.S. at 72.  The Supreme Court explained that the only issue on habeas review of an ambiguous jury charge "is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Id.* (quoting *Cupp*, 414 U.S. at 147 (1973)).  Here, Petitioner's claim is that the absence of a jury charge violated his right to due process.

Petitioner has not directed the Court to any factually similar Supreme Court cases that would permit "contrary review" under § 2254(d)(1), nor can the Court find any such precedent.  Therefore, the Court turns to whether the Appellate Division's determination involved an unreasonable application of the due process standard for "ailing jury instructions."

The Appellate Division held:

> Defendant also asked the court to charge self-defense. The State objected on the basis of lack of notice and lack of evidence. Despite the objection, the court gave the instruction since defendant alleged that Steen was the aggressor. The judge gave the justification self-defense November 2006 Criminal Model Jury charge, including the reference to "deadly force." Standby counsel objected to the instruction on defendant's behalf, asserting defendant requested the instruction only as to punching the victim and denied stabbing him. The judge therefore reinstructed the jury—explaining that it had been brought to his attention that he mistakenly included language regarding deadly force. He clarified that the jury was to consider the self-defense instruction only as to the punching and hand-to-hand altercation defendant had

described. This correction was sufficient to clarify to the
jurors that self-defense related only to the fisticuffs, not to
the stabbing.

If defendant's objection is that the issuance of the self-
defense instruction was a mistake in its entirety, the
doctrine of invited error undercuts any such claim. A
disappointed litigant cannot argue on appeal that an error
was committed by the court when that party "urged the
lower court to adopt the proposition now alleged to be
error." Brett v. Great Am. Recreation, 144 N.J. 479, 503,
677 A.2d 705 (1996); see also N.J. Div. of Youth &
Family Servs. v. M.C. III, 201 N.J. 328, 340, 990 A.2d
1097 (2010). The instruction was given, and then
corrected, at defendant's request.

In this case, in any event, the defense of self-defense was of
dubious provenance. The charge was not supported by the
version of events given by the three independent
eyewitnesses. Since the charge was not supported by the
evidence, the instruction telling the jury to disregard a
portion of it was clearly incapable of producing an unjust
result.

Small, 2011 WL 2637161, at *14.

Petitioner claims he was deprived of his best defense, self-defense.  The

Appellate Division reasonably rejected this claim based on the testimony at trial.

According to the facts found by the Appellate Division on direct appeal, presumed

correct on habeas review, Petitioner testified that he argued with Steen, the victim,

after Steen stole the change from a $50 bill that Petitioner had given him to buy

something at a convenience store.  Petitioner testified that another man interjected

himself into the argument between Petitioner and Steen.  This unknown man and

Steen began punching each other, and the man pulled out a knife and stabbed Steen.

Then, the man left and said he would return.  Petitioner and Steen began arguing

again, and Steen pulled Petitioner out of his wheelchair and started kicking him. The original attacker returned and stabbed Steen again, then gave Petitioner the knife to protect himself. The defense also put on several witnesses. Wade Tyler said he saw this other man fighting with Steen and heard someone shout "he stabbed him." Several witnesses testified that Steen recanted his statement that Petitioner stabbed him.

The Appellate Division reasonably found that a self-defense charge would have been contrary to Petitioner's defense. To be sure, a self-defense jury charge would have undermined any possibility the jury may have credited Petitioner's testimony that someone else stabbed the victim. In addition, a self-defense charge was not supported by the evidence. Therefore, Petitioner was not deprived of his best defense. As the Appellate Division concluded, failure to give the charge "was clearly incapable of producing an unjust result." Therefore, the Appellate Division's determination of this issue was not contrary to nor an unreasonable application of the Supreme Court's decision in *Estelle*. Failure to give the self-defense charge did not fatally infect the entire trial with unfairness. The Court denies Ground Three of the petition.

### F.      Grounds Four and Six of the petition

#### 1.      The Parties' Arguments

Grounds Four and Six of the petition are related. In Ground Four, Petitioner asserts he was prejudiced by the trial court's failure to question two jurors on the prejudicial effect of observing Petitioner escorted by two officers in a private hallway

of the courthouse.  (Pet., Dkt. No. 1 at 27.)  In Ground Six, Petitioner contends the

trial court erred by failing to declare a mistrial based on this incident.  (*Id.* at 29.)  For

habeas relief, Petitioner relies on three Supreme Court cases, *Estelle v. Williams*, 425

U.S. 501 (1976), *Holbrook v. Flynn*, 475 U.S. 560 (1986), and *Carey v. Musladin*, 549

U.S. 70 (2006).  (Petr's Brief, Dkt. No. 1-1 at 14.)

Respondents oppose relief.  (Answer, Dkt. No. 7 at 56-66.)  First, the

Appellate Division found the incident was accidental.  Second, the jurors were

forewarned Petitioner may be escorted to the disabled facilities by Sheriff's officers

because he required assistance with his wheelchair.  Third, the jurors already knew

Petitioner was in custody because he told them himself.  Respondents submit that the

Appellate Division reasonably concluded the jurors' exposure to the officers

escorting Petitioner in his wheelchair outside the courtroom did not present a

manifest injustice that required a mistrial.

## 2.    Analysis

Petitioner relies on three cases, none of which are sufficiently similar to the

factual circumstances in this case to warrant "contrary to" review under § 2254(d)(1).

In *Estelle v. Williams*, the Court held that the State violates due process by compelling

an accused to stand trial before a jury while dressed in identifiable prison clothes.

425 U.S. 501, 512–13 (1976).  In *Holbrook v. Flynn*, the Supreme Court determined

that deployment of security personnel in a courtroom during a criminal trial is not so

inherently prejudicial that it must be justified by "an essential state interest specific to

each trial." 475 U.S. 560, 568–69 (1986). Instead, to determine whether a criminal defendant was denied his due process right to a fair trial, courts must

> look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

*Id.* at 572. Finally, Petitioner relies on *Carey v. Musladin*, 549 U.S. 70 (2006). *Carey* is inapplicable because it involved the question of whether "private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Id.* at 76. This case involves courthouse security practices, having Sheriff's officers escort Petitioner to a handicapped accessible bathroom during breaks in his criminal trial. *Holbrook* is the Supreme Court case that most closely resembles the facts present here.

The highest reasoned state court determination of Grounds Four and Six of the petition is that of the Appellate Division in July 2011, on direct appeal:

> Defendant was not in handcuffs nor in any way restrained. He was not wearing jail attire. Two jurors stopped and watched while one sheriff's officer pushed defendant's wheelchair and the other walked in front of him. When defendant made his application to the trial judge, the prosecutor responded by reminding the court that the jury panel had been initially advised that defendant might have to be escorted to the "disabled facilities" during breaks, and that in any event defendant had told the jury that he was incarcerated.

> The encounter was accidental. The jurors had been forewarned that defendant might be assisted by sheriff's

> officers to the disabled facilities; defendant himself informed the jury that he was in custody. The court's decision denying the motion for a mistrial was certainly warranted. It is an extraordinary remedy granted only to prevent a manifest injustice. State v. Ribalta, 277 N.J.Super. 277, 291, 649 A.2d 862 (App. Div.1994), certif. denied, 139 N.J. 442, 655 A.2d 444 (1995); State v. Hubbard, 123 N.J.Super. 345, 351, 303 A.2d 87 (App.Div.), certif. denied, 63 N.J. 325, 307 A.2d 98 (1973).
>
> Defendant contends that for the jury to see him escorted while in a wheelchair is equivalent to seeing him in shackles or other restraints. Factually, there is no similarity. The encounter was fleeting and accidental. The point does not warrant further discussion.

The Appellate Division reasonably applied *Holbrook* by considering what the two jurors saw, and determining that it was not so inherently prejudicial as to deny Petitioner his right to a fair trial. The presence of the Sheriff's officers was described to the jurors, not as a necessity to protect the public from Petitioner because he was dangerous, but because he needed assistance with his wheelchair to get to the handicapped accessible courtroom facilities. Even if the jurors were influenced by seeing Petitioner in custody, Petitioner cannot show prejudice because he had already told the jury he was in custody for years waiting for his trial. Therefore, the Court denies Grounds Four and Six of the petition because the Appellate Division's determination was not an unreasonable application of clearly established federal law.

### G.   Ground Five of the Petition

In Ground Five of his petition, Petitioner claims "[t]he trial court erred, to Defendant's great prejudice, in admitting a remote prior conviction, and in refusing

30

to sanitize Defendant's prior endangering conviction.  (Pet., Dkt. No. 1 at 28.)

Specifically, Petitioner claims his 1990 offense was too remote in time to be relevant,

and his 1997 conviction for endangering the welfare of a child should have been

sanitized before it was admitted into evidence.  (Petr's Brief, Dkt. No. 1-1.)

Respondents assert that Ground Five of the petition presents a challenge to a state

evidentiary ruling that is not cognizable on habeas review.  (Answer, Dkt. No. 7 at

67-70.)[8]

    "[I]t is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions.  In conducting habeas review, a federal court

is limited to deciding whether a conviction violated the Constitution, laws, or treaties

of the United States."  *Estelle*, 502 U.S. at 67–68.  In his habeas petition, Petitioner

alleges he was prejudiced by the state court's evidentiary ruling.  Petitioner did not

state a federal claim in his habeas petition nor did he rely on a case discussing a

federal constitutional right.  The Appellate Division determined this claim under

---

[8] Respondents cite to the record of the trial court's evidentiary rulings.  On October 23, 2007, prior to trial, the trial court conducted a *Sands* hearing. (Trial Tr., Dkt. No. 7-59 at 25.)  Petitioner had three prior convictions: (1) a March 2, 1990 conviction for aggravated assault on a police officer for which he received four years in state prison; (2) a February 9, 1990 conviction for distribution of cocaine for which he received four years in state prison; and (3) an April 1, 1997 Pennsylvania conviction for endangering the welfare of a child for which he received eleven and a half months to fifty-nine months. (*Id.* at 25-26.)  Although the court made earlier rulings, it revisited the admissibility of Petitioner's prior crimes during trial. (Trial Tr., Dkt. No. 7-69 at 75.)  The court ruled the aggravated assault charge inadmissible, but the 1990 possession and 1997 endangering convictions were admissible as a "series of crimes," and there was no need to sanitize the 1997 crime because it was not similar. (*Id.* at 77-78.)

state law. *Small*, 2011 WL 2637161, at *8-9. Therefore, Ground Five fails to present a cognizable habeas claim.

### H.  Ground Seven of the Petition

#### 1.  The Parties' Arguments

Petitioner asserts in Ground Seven of his petition that the in-court identifications by the State's witnesses were tainted. (Pet., Dkt. No. 1 at 30.) During trial preparation, two or three weeks before trial, the prosecutor met individually with Witnesses Evans, Walker and Rosas and asked if they could describe Petitioner. After they did, the prosecutor showed them Petitioner's photograph. (Petr's Brief, Dkt. No. 1-1 at 15-16.) Petitioner submits the identifications should have been excluded because they were impermissibly suggestive and unreliable. Respondents oppose relief because the trial court held a pretrial *Wade* hearing and properly found the identifications were reliable, and that the brief display of Petitioner's photograph during pretrial preparation did not affect the reliability of the earlier identifications. (Answer, Dkt. No. 7 at 71-77.) Moreover, the evidence against Petitioner was overwhelming, so no prejudice could have resulted from unreliable identifications by the witnesses.

#### 2.  Analysis

The highest reasoned state court determination of this claim is the July 7, 2011 opinion by the Appellate Division on direct appeal.

> By way of introduction, we note that prior to trial, defendant, against the advice of standby counsel, asked the court not to conduct a <u>Wade</u> hearing. Defendant said he

did not want the court to suppress the show-up identifications because at trial his strategy would be to attack the eyewitnesses' testimony as "inaccurate." Nonetheless, the prosecutor requested that a <u>Wade</u> hearing be conducted because defendant was challenging the eyewitness identifications and because show-ups are considered inherently suggestive. After the hearing, the court found that the identifications were sufficiently reliable for a number of reasons. The identifications were made by the eyewitnesses independently of each other, immediately after the crime, defendant matched the "relatively unique description" of the assailant, the eyewitnesses had ample opportunity to observe, and a clear view of, the incident, demonstrated a high level of certainty, and defendant was apprehended in close proximity to the scene wearing bloody clothing and carrying a knife bearing the victim's DNA.

Defendant urges us to find that the court erred in denying his application to suppress eyewitnesses' in-court identifications, and for a mistrial, as a result of the prosecutor showing the eyewitnesses his photograph during trial preparation. While meeting with the prosecutor individually about two or three weeks before trial, Evans, Walker, and Rosas were asked if they could describe defendant. After they indicated they could, the prosecutor showed them defendant's photograph. They uniformly denied that their in-court identification was influenced by seeing this photo prior to trial. The prosecutor represented that the photo was displayed during routine trial preparation, not intended in any way to influence the witnesses.

The court denied the motion for a mistrial because the display of one photo of defendant to the eyewitnesses, if anything, went only to the weight of their in-court identifications. Nothing about the display of the photo in this case is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." <u>Simmons v. United States</u>, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L. Ed.2d 1247, 1253 (1968); <u>State v. Herrera</u>, 187 N.J. 493, 502, 902 A.2d 177 (2006).

33

The relevant clearly established Supreme Court precedent is *Simmons v. U.S.*, 390 U.S. 377 (1968) and its progeny.  In *Simmons*, the Court held:

> each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id.* at 384.  Later, in *Manson v. Brathwaite*, the Supreme Court considered "whether the Due Process Clause of the Fourteenth Amendment compels the exclusion, in a state criminal trial, apart from any consideration of reliability, of pretrial identification evidence obtained by a police procedure that was both suggestive and unnecessary."  432 U.S. 98, 99 (1977).  The Court held that exclusion was not compelled without consideration of reliability of the identification, considering factors laid out in *Neil v. Biggers*, 409 U.S. 188 (1972), including:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* at 114.  Ultimately, a court must determine whether "under all the circumstances of th[e] case there is 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 116 (quoting *Simmons*, 390 U.S. at 384).

34

The question for this Court is whether the Appellate Division reasonably concluded, based on all the circumstances of the case, that there was not a substantial likelihood of misidentification caused by the prosecutor showing the witnesses Petitioner's photograph during trial preparation.  The Appellate Division noted Witnesses Evans, Walker and Rosas separately identified defendant immediately after observing a crime where they had a clear view and an ample opportunity to observe the suspect, whose appearance was unique.[9]  Adding to the reliability of the identifications, Defendant was apprehended in close proximity to the scene, and he was wearing bloody clothing and carrying a knife, later found to bear the victim's DNA.[10]  The Appellate Division found that the eyewitnesses "uniformly denied that their in-court identification was influenced by seeing this photo prior to trial[.]" *Small*, 2011 WL 2637161, at *10.  In making their credibility determinations, the jury was permitted to consider whether the prosecutor's conduct affected the witnesses' identifications of the defendant.  The jury also heard evidence that Steen knew Petitioner, and identified him as his assailant.  The totality of the circumstances support the Appellate Division's conclusion that there was sufficient indicia of

---

[9] The 9-1-1 dispatcher described the suspect as a black male with dreadlocks in a wheelchair, wearing a gray t-shirt, cream colored pants, fleeing on Marlton Pike towards Camden. (*Wade* Hearing Tr., Dkt. No. 7-56 at 15.)

[10] Officer Sands was involved in Petitioner's apprehension immediately after the crime, and he saw Officer Gehring remove a knife from Petitioner's pocket, just prior to the witnesses' individual "show-up" identifications.  (*Wade* Hearing Tr., Dkt. No. 7-56 at 16) (spelling of "Gehring" corrected in the Appellate Division's Opinion).

reliability of the witnesses' identifications.  Therefore, Ground Seven of the petition is denied.

## I.     Ground Eight of the Petition

### 1.     The Parties' Arguments

Defendant represented himself at trial.  He alleges that he was prejudiced by the trial court's ruling that he did not have a constitutional right to unlimited access to the inmate law library in the county jail where he was confined.  (Pet., Dkt. No. 1 at 31-32; Petr's Brief, Dkt. No. 1-1 at 12-13.)   Petitioner spent time in disciplinary confinement as the result of a jail infraction.  While in disciplinary confinement, the county jail administrators did not permit Petitioner access to the law library.  He was able to request legal materials from the librarian.  Petitioner asserts that the state court unreasonably applied the Supreme Court decision in *Lewis v. Casey*, 518 U.S. 342 (1996), which recognized a prisoner's First Amendment right of access to the courts.

Respondents submit that Petitioner failed to show that the state court's ruling was contrary to or involved an unreasonable application of federal law or that the state court made an unreasonable determination of the facts.  (Answer, Dkt. No. 7 at 78-87.)  The Supreme Court has not recognized a free standing right to access a law library or legal assistance.  Instead, to establish denial of the right of access to courts, an inmate must demonstrate his lack of access to legal materials or assistance actually hindered his efforts to pursue a legal claim.  Petitioner only vaguely asserted that he was not given adequate time to prepare himself for trial.

36

2.    **Analysis**

The relevant Supreme Court holding concerning the applicability of the First

Amendment right of access to a law library by an inmate who is representing himself

in a criminal trial is *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005).  The Court held, in

pertinent part:

> it is clear that *Faretta*[11] does not, as § 2254(d)(1) requires,
> "clearly establis[h]" the law library access right. In fact,
> *Faretta* says nothing about any specific legal aid that the
> State owes a pro se criminal defendant. The *Bribiesca*
> court[12] and the court below therefore erred in holding,
> based on *Faretta*, that a violation of a law library
> right is a basis for federal habeas relief.

Therefore, Ground Eight of the petition fails to state a cognizable habeas claim.  For

the sake of completeness, however, the Court will address reasonableness of the

Appellate Division's application of the facts to the Supreme Court's decision in

*Lewis*.

The highest reasoned state court determination of this claim is the July 7, 2011

Opinion of the Appellate Division on direct appeal.

> Pre-trial, defendant filed a motion for direct access to the
> inmate law library for four hours per day, three days per
> week. The application was denied, and defendant now
> contends this too was reversible error. Defendant was not
> permitted to go to the inmate law library because he was in
> isolation as a result of an infraction committed some two
> or three weeks prior. The court, *sua sponte*, asked the
> county to participate in the hearing on defendant's
> application.

[11] *Faretta v. California*, 422 U.S. 806 (1975).

[12] *Bribiesca v. Galaza*, 215 F.3d 2015 (9th Cir. 2000).

County counsel explained that defendant was a security risk with an extensive disciplinary record, including thirty-nine separate charges for various infractions of jail rules and policies. In fact, defendant had recently been placed in isolation for assaulting another inmate, but would be released into administrative segregation in twenty-five days. The county jail did not provide access to the law library to inmates who were in isolation or administrative segregation, but inmates could, despite this classification, request material from the librarian. Defendant also had available research conducted by his standby counsel. In the relevant time span, despite his lack of direct access, defendant filed numerous pretrial motions.

Furthermore, county counsel represented that the jail warden agreed that once defendant was released from isolation, if he remained infraction-free, he would be granted access to the library one hour per day, three times per week, the same as every other inmate.

The court determined that a defendant who chooses to represent himself does not thereby acquire a constitutional right to unlimited access to an inmate law library. Since the county agreed to extend library privileges to defendant the same as any other inmate once he was released from isolation, there was no necessity for defendant to be granted additional relief. In light of defendant's indirect access to materials through standby counsel and upon request to the law librarian, nothing further was required. During a scheduling conference some months later, standby counsel raised the subject as defendant was still in segregation. He was not permitted to go to the law library, but continued to be allowed to request materials and had them available through a standby counsel. Defendant conceded that he had "tons of paperwork in his cell." As a result, the court instructed counsel to supply defendant with his own copy of the New Jersey Court Rules and the Rules of Evidence. But because defendant continued in isolation, presumably as a result of further disciplinary infractions, no further relief was granted. As the court said, defendant had the keys to the library. If he stopped

> committing disciplinary infractions, he would then acquire direct access.
>
> Defendant takes the position that, even though the Supreme Court has not recognized a pro se defendant's federal constitutional right to direct access to the law library, we should interpret our State Constitution more broadly and find that such a right exists. We decline the invitation as in this case, defendant's own conduct created the limitation and, in actuality, any materials he needed were available through standby counsel and the inmate law librarian in addition to retaining materials in his cell, including the Court Rules and Rules of Evidence. Defendant does not explain the additional benefit he would have gained from direct access given these other resources. Instead, he merely claims he was denied "an adequate opportunity to prepare," an allegation not supported by the record.

*Small*, 2011 WL 2637161, at *11–12.

In *Lewis*, the Supreme Court held an inmate must demonstrate that the shortcomings in access to the law library or legal assistance hindered his efforts to pursue a legal claim.  Petitioner only vaguely asserts that he had inadequate time to prepare for trial.  The Appellate Division's Opinion  involves a reasonable application of *Lewis* because the court considered that Petitioner had access to legal research without visiting the law library; he could have legal materials sent to his cell by the inmate law librarian or Standby counsel.  The Appellate Division also reasonably applied *Lewis* when it determined Petitioner failed to describe a specific legal claim that likely would have been successful if he had greater access to the law library.  Therefore, Ground Eight of the petition is denied.

### J.       Ground Nine of the Petition

#### 1.       The Parties' Arguments

In Ground Nine of the Petition, Petitioner claims the trial judge erred by refusing to recuse himself after he learned that Petitioner was involved in an altercation with a relative of the judge's staff.  (Pet. Dkt. No. 1 at 33.)  Respondents describe the occurrence and conclude that Appellate Division reasonably rejected the claim as meritless.  (Answer, Dkt. No. 7 at 88-91.)  On October 23, 2007, the trial court stated on the record that he had learned Petitioner had been involved in altercation in the jail with a court staff member's sister.  (Trial Tr., Dkt. No. 7-59 at 47.)  The trial court described the staff member as someone who worked in "the back office" and had "no role in the adjudication process other than scheduling[,]" which had already been completed.  (*Id.* at 47-48.)  The staff member was one of ten employees assigned to the judge's courtroom, and the trial court had no relationship with her, and knew nothing about her family.  (*Id.* at 48-49.)

Petitioner asked the trial court to recuse himself.  (*Id.* at 49-50.)  The trial court denied the recusal motion because, although the issue was brought to his attention, he was not familiar with what had actually happened, he did not work closely with the court staff member or have a personal relationship with her or any member of her family. (*Id.* at 52-53.)  The trial court stated, "[i]f I thought that there were any possibility of this having any impact on me I would absolutely recuse myself. But, there is no basis." (*Id.* at 53.)

2.      Analysis

The Supreme Court has long acknowledged that "a 'fair trial in a fair tribunal

is a basic requirement of due process.'"  *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)

(quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).  Thus, "various situations have

been identified in which experience teaches that the probability of actual bias on the

part of the judge or decisionmaker is too high to be constitutionally tolerable."  *Id.* at

47.  The due process inquiry is objective, "whether the average judge in his position

is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'"

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009).

The question on habeas review is whether the Appellate Division's summary

dismissal of this claim involves an unreasonable application of the objective inquiry

described in *Caperton*.  Here, the trial court did not work closely with the court staff

member or have any personal relationship with her, knew nothing of her sister, and

disclosed the incident, stating there was no possibility the information he acquired

would have any impact on him.  The record supports the reasonableness of the

Appellate Division's conclusion that Petitioner's claim of prejudicial bias was

without merit.  Thus, Ground Nine of the petition is denied.

K.    **Ground Ten of the Petition**

In Ground Ten of his petition, Petitioner alleges the trial court imposed an

excessive sentence by improperly determining and weighing the aggravating and

mitigating factors, and by imposing an extended term under the New Jersey

persistent offender statute.  (Pet., Dkt. No. 1 at 34.)  Respondents oppose relief

because challenges to sentences under state law are not cognizable on habeas review.
(Answer, Dkt. No. 7 at 92-93.)  Ground Ten does not involve a question of federal
law.  Therefore, it is not cognizable on habeas review.  *See*, *Wainwright v. Sykes*, 433
U.S. 72, 81 (1977) (stating federal habeas review of state substantive law is barred).

### L.   Grounds Twelve and Thirteen

#### 1.   The Parties' Arguments

Ground Eleven of the petition involves the cumulative effect of trial court
errors and will be addressed as the final claim.  Grounds Twelve and Thirteen,
reproduced below, are related:

> Ground Twelve:  Defendant's prior appellate and post-
> conviction counsel were ineffective in failing to raise the
> argument that defendant did not knowingly and
> intelligently waive his right to counsel, in light of the trial
> court's misinforming Defendant as to his maximum jail
> exposure.
>
> [supporting facts]  Petitioner's post-conviction attorneys
> were ineffective because neither argued that defendant's
> waiver of his right to counsel was not knowing and
> intelligent, because he was misinformed as to the length of
> the potential sentence. This was a misstatement, as
> defendant was extended-term eligible. See Point I of
> Appellant's Brief on behalf of Defendant filed in
> PCR appeal, incorporated here by reference.
>
> Ground Thirteen:  Defendant's subsequent ambiguous
> comments regarding his maximum sentencing exposure
> negated the trial court's requirement that Defendant be
> informed as to his maximum exposure before waiving his
> right to counsel and being able to proceed pro se at trial.
>
> [supporting facts]  Defendant was misinformed as to the
> length of his potential sentence – he was extended-term
> eligible; the misinformation provided to defendant was

> reflected in the state court record including defendant's
> own statements, vitiating the required *Faretta* waiver
> requirements.

(Pet., Dkt. No. 1 at 36-28.)  In his memorandum of law in support of Grounds

Twelve and Thirteen, Petitioner argues that the Appellate Division erred by applying

a harmless error analysis to the *Faretta* waiver of counsel requirements.  (Petr's Brief,

Dkt. No. 1-1 at 9-12.)  Petitioner relies primarily on *United States v.- Erskine*, 355 F.3d

1161, 1167 (9th Cir. 2004) and *U.S. v. Mohawk*, 20 F.3d 1480, 1484 (9th Cir. 1994).

Respondents submit that Ground Thirteen is unexhausted and procedurally

defaulted because it was raised for the first time in Petitioner's habeas petition.

(Answer, Dkt. No. 7 at 41-42.)  Concerning Ground Twelve, Respondents argue that

the Appellate Division, on PCR review, reasonably applied the *Strickland* standard

for ineffective assistance of counsel claims.  (*Id.* at 96-107.)  Respondents contend the

Appellate Division properly found that Petitioner was fully aware of the possibility

that he could spend the rest of his life in prison, and that his appellate counsel cannot

be faulted for failing to raise a claim on appeal that would have failed.

## 2.    Analysis

As an initial matter, the Court construes Ground Thirteen as a supplement to

Ground Twelve.  Petitioner raised Ground Twelve, for the first time, on appeal from

denial of his PCR petition.  (Dkt. No. 7-40 at 28-35.)  Thus, the claim was not

exhausted in the PCR Court.  Unexhausted claims, however, may be denied on the

merits, if appropriate.  § 2254(b)(2).  Because Ground Twelve, as supplemented by

Ground Thirteen, is without merit, the Court will address the substance of the claims.

Petitioner brings ineffective assistance of counsel claims against his appellate counsel and PCR counsel for failing to challenge the knowing and voluntary nature of his waiver of the right to counsel at trial.  There is no constitutional right to effective assistance of PCR counsel.  *Coleman v. Thompson*,  501 U.S. 722, 752 (1991) (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989) (applying the rule to capital cases)).  There is, however, a constitutional right to appellate counsel, described by the Supreme Court in *Jones v. Barnes* as follows:

> This Court, in holding that a State must provide counsel for an indigent appellant on his first appeal as of right, recognized the superior ability of trained counsel in the "examination into the record, research of the law, and marshalling of arguments on [the appellant's] behalf," *Douglas v. California*, 372 U.S., at 358, 83 S.Ct., at 817…. Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.
>
> There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review. . . .For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders*. Nothing in the Constitution or our interpretation of that document requires such a standard.

463 U.S. 745, 751–54 (1983).

To assess the performance of appellate counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466

U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See United States v. Cross*, 308 F.3d 308, 315 n.12 (3d Cir. 2002). Under *Strickland*, a petitioner must first establish that counsel's performance "fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. 2052. In making this determination, *Strickland* cautioned that courts should be "highly deferential" when assessing counsel's performance and requires courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. Second, a petitioner must show that he was prejudiced by counsel's deficient performance, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

*United States v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020). Thus, the issue is whether the Appellate Division's opinion denying Petitioner's ineffective assistance of counsel claim involved an unreasonable application of the *Strickland* standard of review. Specifically, whether appellate counsel's failure to challenge Petitioner's waiver of his right to counsel involved constitutionally deficient performance, and if so, has Petitioner established that he was prejudiced.

The Supreme Court's decision in *Faretta v. California* governs a criminal defendant's right self-representation. The *Faretta* Court held,

> [w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits.

422 U.S. 806, 835 (1975).  It is the trial court's duty to determine "whether there is

an intelligent and competent waiver by the accused."  *Glasser v. United States*, 315

U.S. 60, 71 (1942)).  "Waivers of constitutional rights not only must be voluntary but

must be knowing, intelligent acts done with sufficient awareness of the relevant

circumstances and likely consequences."  *Brady v. United States*, 397 U.S. 742, 748

(1970)).  The trial court must rigorously convey the pitfalls of proceeding to trial

without counsel.  *Iowa v. Tovar*, 541 U.S. 77, 89 (2004) (citing *Patterson v. Illinois*, 487

U.S. 285, 108 (1988)).

> "[T]he law ordinarily considers a waiver knowing,
> intelligent, and sufficiently aware if the defendant fully
> understands the nature of the right and how it would likely
> apply in general in the circumstances—even though the
> defendant may not know the specific detailed
> consequences of invoking it." *United States v. Ruiz*, 536
> U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002)
> (emphasis in original). We similarly observed in *Patterson*:
> "If [the defendant] ... lacked a full and complete
> appreciation of all of the consequences flowing from his
> waiver, it does not defeat the State's showing that the
> information it provided to him satisfied the constitutional
> minimum." 487 U.S., at 294, 108 S.Ct. 2389 (internal
> quotation marks omitted).

*Tovar*, 541 U.S. at 92.

The Appellate Division reviewed the PCR court's denial of this claim.

> Defendant Robert Small represented himself during the
> jury trial that resulted in his convictions for first-degree
> attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a) (count
> one); second-degree aggravated assault, N.J.S.A. 2C:12-
> 1(b)(1) (count two); third-degree aggravated assault,
> N.J.S.A. 2C:12-1(b)(2) (count three); third-degree
> possession of a weapon for an unlawful purpose, N.J.S.A.

2C:39-4(d) (count four); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count five). On January 25, 2008, defendant was sentenced as a persistent offender, N.J.S.A. 2C:44-3(a), to an aggregate thirty-five year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2(a).

. . .

Of relevance to this decision is a misstatement by the prosecutor, concurred with by defense counsel during the argument on defendant's motion for self-representation. Initially, the court advised defendant that if convicted, he could be sentenced to seventy-eight years with forty-two and a half years of parole ineligibility. The prosecutor interrupted and said defendant was not eligible for extended term sentencing under the persistent offender statute, because he may have been only nineteen-years-old when one of the predicate offenses was committed. The judge then changed course, and advised defendant his exposure was twenty years for the attempted murder, twenty years for armed robbery, and ten years for aggravated assault, all subject to NERA. Later in the hearing, the judge asked defendant to state his sentence potential. Defendant replied, "[twenty] years for attempted murder, [twenty] years for ... armed robbery, [ten] years for ... aggravated assault, ... [five] years for ... possession of a weapon...." Defendant's motion was granted.

Some six months later, defendant's standby counsel, during a pretrial proceeding referred to the fact that if found to be a persistent offender, for which defendant "qualifies technically[,]" he could be sentenced to life, eighty-five percent of which would be served without parole. A few minutes later, counsel repeated that defendant could be sentenced to life.

Prior to trial, on several occasions, the judge asked defendant to confirm that he wished to continue to represent himself. Defendant reiterated his intent to do so in the strongest of terms. At one point, in pretrial hearings, the judge said to defendant "[t]he odds are you are going to go to jail for the rest of your life," to which defendant

responded, "[c]orrect." Twice in that same proceeding,
defendant referred to his potential maximum sentence as
"a hundred years."

. . .

It is well established that in order for a defendant to obtain
relief based on ineffective assistance of counsel, he must
demonstrate not only the particular manner in which
counsel's performance was deficient, but also that the
deficiency prejudiced his right to a fair trial. Strickland v.
Washington, 466 U.S. 668, 687 (1984). We are persuaded
that the alleged deficiencies here clearly fail to meet either
the performance or prejudice prongs of the Strickland test.
Defendant has not demonstrated any deficiency on the
part of appellate or PCR counsel.

Defendant claims his appeal and PCR attorneys were
ineffective because neither argued that his waiver of his
right to counsel was not knowing and intelligent, because
he was misinformed as to the length of any potential
sentence. Although we agree that there was a
misstatement, as defendant was extended-term eligible, we
do not agree that he did not know the risks of proceeding
pro se. This defendant was fully aware, as documented in
the record, that he could spend the rest of his natural days
in prison if convicted. Not only did the judge say it to him,
defendant said it himself. Counsel cannot be faulted for
failing to make arguments that would have failed. See
State v. DiFrisco, 174 N.J. 195, 236 (2002). Defendant
knew the length of imprisonment he faced and was
adamant that he wanted to represent himself.
. . .

Neither point on appeal satisfies the first prong of
*Strickland*. Neither point satisfies the second.

*State v. Small*, No. A-3040-17T1, 2019 WL 2871077, at *1–3 (N.J. Super. Ct. App.

Div. July 3, 2019).

Grounds Twelve and Thirteen of the petition fail on habeas review for two reasons.  First, the habeas standard of review places a burden on the petitioner to establish that the state court's determination was contrary to or involved an unreasonable application of clearly established federal law, defined as the holding of a Supreme Court decision at the time of the relevant state court decision.  Therefore, Petitioner's reliance on Ninth Circuit cases, *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004)[13] and *U.S. v. Mohawk*, 20 F.3d 1480, 1484 (9th Cir. 1994)[14] stating that failure to comply with the *Faretta* waiver requirements is per se prejudicial, does not provide the correct standard for habeas review.

Second, under the *Strickland* standard for habeas review of an ineffective assistance of counsel claim, appellate counsel is not required to raise every colorable claim on direct appeal.  *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones*, 463 U.S. at 754).  The record establishes that, at an early pretrial status conference, the trial court initially went along with the prosecutor's misstatement that Petitioner was not extended term eligible.  (Status Conf. Tr., 7-51 at 10-13.)  Any harm from this

---

[13] In *Erskine*, unlike here, the record showed the defendant was not aware of his maximum sentence exposure at any point prior to or during trial, or even at sentencing.  *Erskine*, 355 F.3d at 1165.  Erskine was sentenced at twice the length of time he had been led to believe was the maximum allowed.  *Id.*  Here, Petitioner was sentenced to a total prison term of 35 years, which is less than the 55 years (assuming consecutive sentences) he had initially been led to believe; although this was later corrected by Standby counsel, who informed Petitioner and the court that Petitioner was extended term eligible.

[14] In *Mohawk*, there was no contemporaneous record of the *Faretta* waiver colloquy with the court.  20 F.3d at 1484.  Thus, the appellate court had to assume the trial court "wholly failed to discuss the question of waiver" with the defendant, and reversal of the conviction was required.  *Id.*

misstatement was cured at a June 12, 2007 motion hearing, when Standby counsel noted that Petitioner technically qualified for the persistent offender statute, and this would likely result in a life sentence (Mot. Tr., Dkt. No. 7-54 at 4-5); and reiterated when the trial court advised Petitioner "[t]he odds are you are going to go to jail for the rest of your life," and Petitioner responded "correct." (Trial Tr., Dkt. No. 7-59 at 6.) In view of this colloquy, and all of the repeated warnings and advice of the trial court against self-representation (Status Conf. Tr., Dkt. No. 7-51), appellate counsel exercised his professional judgment by not raising this claim on appeal. Therefore, the Appellate Division's rejection of his claim did not involve an unreasonable application of the *Strickland* standard for ineffective assistance of counsel claims.

### M.   Ground Eleven of the Petition

In Ground Eleven of the petition, Petitioner asserts that he was denied due process by the cumulative errors of the trial court. Because this Court has found no errors by the trial court, this claim fails.

## III.   CERTFICATE OF APPEALABILITY

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. For the reasons discussed above, reasonable jurists would not find denial of the habeas petition debatable.  Accordingly, no certificate of appealability shall issue.

## IV.   CONCLUSION

Petitioner has not established his burden to show the state courts Therefore, the Court will deny the habeas petition, and no certification of appealability shall issue.

An appropriate Order follows.

**Date:  July 6, 2023**

s/Renée Marie Bumb
RENÉE MARIE BUMB
Chief United States District Judge

51